

NUMBER 13-06-00407-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF T. J. H., A CHILD

## On appeal from the 343rd District Court of Bee County, Texas.

# MEMORANDUM OPINION

## Before Justices Yañez, Rodriguez, and Vela
## Memorandum Opinion by Justice Yañez

Appellee, the Texas Department of Family and Protective Services ("the Department"), brought suit for termination of Mary's and Bob's parent-child-relationship with T.J.H., the biological child of both Mary and Bob.[1]  A hearing addressing the termination of Mary's parental rights was held before the trial court—separate from any discussion addressing the termination of Bob's parental rights.  Following the hearing, the trial court determined that Mary endangered T.J.H. under the terms of subsections

---

[1] To protect the privacy of the minor child and the parties, we have substituted fictitious names for the parties, and refer to the child by his initials.  *See* TEX. FAM. CODE ANN. §109.002(d) (Vernon 2008); TEX. R. APP. P. 9.8(b)(2).

161.001(1)(D) and (E) of the Texas Family Code,[2] and it determined that termination of Mary's parental rights was in T.J.H.'s best interest.[3]  The trial court subsequently entered an order terminating Mary's parent-child relationship with T.J.H., and this appeal followed. Though the trial court later entered an order terminating Bob's parental rights, this appeal only concerns the termination of Mary's parental rights.  On appeal, Mary challenges the legal and factual sufficiency of the evidence supporting the trial court's findings in support of termination.  Mary also argues that she received ineffective assistance of counsel at the termination hearing.  For reasons set forth below, we affirm.

## I. BACKGROUND

Mary is the biological mother of V.H., D.H., and T.J.H.  The parental termination order at issue, however, only concerns T.J.H.  Mary's first child is a boy, V.H., whose biological father is Tom.  At the termination hearing, Mary testified that she and Tom had shared custody of V.H., but she had not seen V.H. in four years because Tom changed residences and moved to an unknown location with V.H.  Mary's second child is a girl, D.H., whose biological father is Joe.  Mary and Joe never married.  Mary had custody of D.H. when she later married Bob in July 1998.  It was with Bob that Mary had her third child, a son, T.J.H., in February 1999.

In May 2002, Mary, Bob, D.H., and T.J.H. were all living together.  On May 26, Mary walked into her living room and glimpsed what appeared to be inappropriate physical contact between D.H. and Bob.  Mary privately questioned D.H. about the contact later that day, at which point D.H. made an outcry of sexual abuse.  The following day, Mary

---

[2] *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (Vernon 2008).

[3] *See id.* § 161.001(2).

reported D.H.'s outcry to law enforcement authorities. D.H. was then interviewed by a social worker, at which time she revealed multiple incidents of sexual abuse that Bob committed against her. Mary subsequently separated herself and the children from Bob and divorced him in October 2002. Furthermore, D.H.'s biological father, Joe, upon learning of D.H.'s abuse, sought and obtained shared custody of D.H. The custody agreement between Mary and Joe involved each party having custody of D.H. for alternating six-month periods. In January 2003, Bob pleaded guilty to aggravated sexual assault—stemming from his sexual abuse of D.H.—and was sentenced to fifty years' imprisonment.

Mary later married Harry. The appellate record does not reveal the exact date of Mary's marriage to Harry. It is clear from the record, however, that Mary and Harry were married prior to August 22, 2005. The record reflects that for an unspecified time prior to this date, Mary, Harry, and T.J.H. lived together, and D.H. lived with them during Mary's six-month-custody periods. On the morning of August 22, 2005, educators at a school T.J.H. attended observed bruising, swelling, and red marks on T.J.H.'s body (hereinafter referred to as "the belt incident"). While under questioning, T.J.H. stated that Harry had hit him with a belt and belt buckle. Educators at the school contacted law enforcement authorities. Soon thereafter, Child Protective Services (CPS) removed D.H. and T.J.H. from Mary's home while the belt incident was under investigation. D.H. was placed in Joe's custody pursuant to an agreed order entered into by Mary and Joe. T.J.H. was placed in the Department's custody.

The Department's initial family service plan for Mary and Harry sought to reunite them with T.J.H. The Department set aside the plan, however, after Harry was indicted for

3

injury to a child, a charge that stemmed from the belt incident.  The Department then constructed a new family service plan which sought termination rather than reunification. The Department also pursued its previously filed suit against Mary and Bob, wherein the Department sought to terminate their parental rights to T.J.H. if reunification could not be achieved.  At some point during this time, the Department validated that Harry had committed physical abuse against T.J.H. in relation to the belt incident.  On June 20, 2006, after a two-day hearing, the trial court entered an order terminating Mary's parental rights. On August 3, 2006, the trial court held a hearing on the Department's suit to terminate Bob's parental rights to T.J.H.; at the close of the hearing, the trial court entered an order terminating Bob's rights.

## II. STATEMENT OF POINTS

Section 263.405 of the Texas Family Code governs an appeal of a final order related to a child under the Department's care.[4]  A party who intends to appeal a trial court's termination order is required to timely file "a statement of the point or points on which the party intends to appeal."[5]  The statement must be filed with the trial court "[n]ot

---

[4] Paragraph (b) of the version of section 263.405 in effect at the time the Department filed its original petition in this case stated that "[n]ot later than the 15th day after the date a final order is signed by the trial judge, a party intending to appeal the order must file with the trial court a statement of the point or points on which the party intends to appeal. The statement may be combined with a motion for a new trial." Act of June 15, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 Tex. Gen. Laws 2395, 2397-98, amended by Act of June 16, 2007, 80th Leg., R.S., ch. 526, § 2, 2007 Tex. Gen. Laws 929; see Act of June 16, 2007, 80th Leg., R.S., ch. 526, § 6, 2007 Tex. Gen. Laws 929, 929-30 ("The changes in law made [to this subsection] apply only to a suit affecting the parent-child relationship filed on or after the effective date of this Act [ June 16, 2007]. A suit affecting the parent-child relationship filed before the effective date of this Act is governed by the law in effect on the date the suit was filed, and the former law is continued in effect for that purpose.") (current version at TEX. FAM. CODE ANN. § 263.405(b), (b-1) (Vernon 2008)). The Department filed suit for termination of parental rights as to T.J.H. on August 23, 2005; the termination order is dated June 20, 2006.  This case is therefore governed by the previous version of the statute.  The Texas Supreme Court recently noted that the 2007 amendments "made no apparent substantive change to the statement of points requirement." *In the Interest of J.O.A.*, 283 S.W.3d 336, 341 n.2 (Tex. 2009).  Unless otherwise specified, all references in this opinion to section 263.405 are to the former version of the statute.

[5] TEX. FAM. CODE ANN. § 263.405(b).

4

later than the 15th day after the date the *final order* is signed by the trial judge."[6]  On appeal, this Court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of points.[7]

The Department asserts that Mary did not timely file a statement of points because (1) the trial court issued a final order when it terminated Mary's parental rights on June 20, 2006, and (2) Mary made no filings with the trial court during the fifteen days that followed. Mary refutes the Department's position, arguing that (1) the order terminating her parental rights was not a final order because it did not dispose of all the parties and claims in the Department's suit; (2) the trial court's judgment became a final order on August 3, 2006, when the court entered an order terminating Bob's parental rights; (3) her statement of points was filed with the trial court on July 19, 2006, when she filed a motion for new trial;[8] and (4) because her statement of points was filed prior to the trial court's judgment becoming final, it should be deemed filed on the date of but subsequent to the time the trial court's judgment became final.[9]

An order is generally considered to be interlocutory if it does not dispose of all the parties or claims in a case.[10]  In the instant case, it is undisputed that the termination order rendered on June 20, 2006 did not dispose of all the parties and would be considered an interlocutory order under the general rule.  Nevertheless, relying on section 263.401 of the

---

[6] *Id.* (emphasis added).

[7] *Id.* § 263.405(d).

[8] *See id.* § 263.405(b) (allowing for a statement of points to be combined with a motion for new trial).

[9] *See* TEX. R. CIV. P. 306c ("No motion for new trial or request for findings of fact and conclusions of law shall be held ineffective because prematurely filed; but every such motion shall be deemed to have been filed on the date of but subsequent to the time of signing of the judgment the motion assails . . . .").

[10] *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 & n.12 (Tex. 2001).

5

family code[11] and the Waco Court of Appeals' opinion in *In re T.L.S.*,[12] the Department contends that the order terminating Mary's parental rights was a final and appealable order.

Section 263.401 pertains to the dismissal of a suit affecting the parent-child relationship filed by the Department.[13] Subsection 263.401(a) requires the trial court to dismiss a suit filed by the Department if the suit has been pending for one year and the court has not "rendered a *final order* or granted an extension under subsection (b)."[14] Subsection (d) defines a "final order" as an order that "terminates the parent-child relationship and appoints . . . the department as managing conservator of the child."[15]

In *In re T.L.S.*, the court of appeals sought to determine whether a parent, whose parental rights had been terminated, had timely filed a notice of appeal under subsection 263.405(a),[16] which stated: "An appeal of a *final order* rendered under this subchapter is governed by the rules of the supreme court for accelerated appeals in civil cases . . . ."[17] Accordingly, subsection 263.405(a) required a party to file a notice of appeal within twenty

---

[11] *See* Act of May 28, 1997, 75th Leg., R.S., ch. 603, 1997 Tex. Sess. Law Serv. 2123 (amended 2001, 2005, 2007) (current version at TEX. FAM. CODE ANN. § 263.401 (Vernon 2008)). Unless otherwise specified, all references in this opinion to section 263.401 are to the version of the statute in effect when the Department filed suit, which is the version prior to the 2007 amendments.

[12] 143 S.W.3d 284 (Tex. App.–Waco 2004, no pet.).

[13] TEX. FAM. CODE ANN. § 263.401.

[14] *Id.* § 263.401(a) (emphasis added).

[15] *Id.* § 263.401(d); *See* Act of May 28, 1997, 75th Leg., R.S., ch. 603, 1997 Tex. Sess. Law Serv. 2123, *repealed by* Act of May 27, 2007, 80th Leg., R.S., ch. 866, § 5 (repealing section 263.401(d)); § 6 ("The changes in law made by this Act to Sections 263.401, 263.402, and 263.403, Family Code, apply only to a suit affecting the parent-child relationship filed on or after the effective date of this Act [September 1, 2007]. A suit affecting the parent-child relationship filed before the effective date of this Act is governed by the law in effect at the time the suit was filed, and the former law is continued in effect for that purpose."), 2007 Tex. Sess. Law Serv. 1841-42.

[16] 143 S.W.3d at 287-89.

[17] TEX. FAM. CODE ANN. § 263.405(a) (emphasis added).

days after the trial court entered a final order.[18] The court of appeals sought to define the term "final order" within subsection 263.405(a) by applying subsection 263.401(d)'s definition of a "final order,"[19] which, as stated above, defines a final order as an order that terminates the parent-child relationship and appoints the Department as managing conservator of the child.[20] By applying subsection 263.401(d)'s definition of a "final order" to subsection 263.405(a), the court of appeals determined that the trial court's complained-of order—which terminated the parental rights of one parent and appointed the Department as the child's managing conservator—was a final order for purposes of calculating the appellate timetable,[21] even though it did not adjudicate the rights of all parties to the proceeding or all pending claims.[22] As a consequence, the court of appeals dismissed the parent's appeal because she had not filed her notice of appeal within twenty days after the "final order" was signed.[23]

Subsection 263.401(d)'s definition of a "final order" and its applicability to subsection 263.405's use of the term "final order" has been discussed by the El Paso Court of Appeals. In two opinions issued in December 2008, the El Paso Court rejected *In re T.L.S.*'s reasoning and found that subsection 263.401(d) is inapplicable to section

---

[18] *See* TEX. R. APP. P. 26.1(b) (stating that "in an accelerated appeal, the notice of appeal must be filed within 20 days after the judgment or order is signed").

[19] *In re T.L.S.*, 143 S.W.3d at 287.

[20] TEX. FAM. CODE ANN. § 263.401(d)(4).

[21] *In re T.L.S.*, 143 S.W.3d at 289.

[22] *Id.* at 287.

[23] *Id.* at 290.

7

263.405.[24]  In one of these opinions, the court explained:

> We decline to follow [*In re T.L.S.*].  The [Waco Court of Appeals] failed to consider that Section 263.401(d) begins with the phrase[,] "For purposes of this section . . . ."  The plain meaning of that phrase is to limit the application of the definition to Section 263.401.  If the Legislature had intended for Section 263.401(d)'s definition of "final order" to apply elsewhere, it would not have limited its application to Section 263.401.[25]

We agree with the El Paso Court of Appeals.  If the Legislature had wanted to make subsection 263.401(d) applicable to section 263.405, the Legislature would have written subsection 263.401(d) to begin with the phrase, "For purposes of this subchapter," rather than, "For purposes of this *section* . . . ."[26]  The Legislature elected not to do this.[27]  In agreement with the El Paso Court of Appeals' holdings in *D.R.* and *M.C.*, and in accordance with the Texas Supreme Court's mandate that involuntary termination statutes be strictly construed in favor of the parent,[28] we find that the trial court's June 20, 2006 order terminating Mary's parental rights was an interlocutory order that did not become final (for purposes of section 263.405) until the trial court entered the order terminating Bob's parental rights on August 3, 2006.[29]  There is no evidence in the record that the trial court signed an order of severance so as to make the otherwise interlocutory order against Mary

---

[24] *See D.R. v. Tex. Dep't of Family & Protective Servs.*, 281 S.W.3d 598, 600-01 (Tex. App.–El Paso 2008, no pet.); *M.C. v. Tex. Dep't of Family & Protective Servs.*, No. 08-08-00053-CV, 2008 Tex. App. LEXIS 9184, *5-8 (Tex. App.–El Paso Dec. 11, 2008, no pet.).

[25] *M.C.*, 2008 Tex. App. LEXIS 9184, at *7-8.

[26] TEX. FAM. CODE ANN. § 263.401(d)(4) (emphasis added).

[27] We observe that the Legislature has used the phrase, "For purposes of this subchapter," to limit the applicability of a definition elsewhere in the family code.  *See*, *e.g.*, TEX. FAM. CODE. ANN. § 3.402(a) ("For purposes of this subchapter, 'economic contribution' is the dollar amount of . . . .").

[28] *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).

[29] *See D.R.*, 281 S.W.3d at 600-01; *M.C.*, 2008 Tex. App. LEXIS 9184 at *5-8; *see also In re C.H.*, No. 2-09-060-CV, 2009 Tex. App. LEXIS 3940, *1-3 (Tex. App.–Fort Worth June 4, 2009, no pet. h.) (mem. op.).

final for purposes of appeal. Moreover, we observe that the orders terminating Mary's and Bob's parental rights have the same trial cause number, and that Mary's separate termination hearing does nothing to negate the interlocutory nature of the June 20, 2006 order against her.[30]

Mary filed a motion for new trial with the trial court on July 19, 2006. To whatever extent Mary's motion for new trial can be deemed prematurely filed—due to the fact that the June 20, 2006 order did not dispose of all the parties in the case (i.e., Bob)—the rules of civil procedure directed the trial court to deem the motion as having been filed on the date of but subsequent to the time the order became final (i.e., Mary's motion should be deemed filed immediately after the trial court entered the order terminating Bob's parental rights on August 3, 2006).[31]

Subsection 263.405(b) of the family code states: "Not later than the 15th day after the date a final order is signed by the trial judge, a party intending to appeal the order must file with the trial court a statement of the point or points on which the party intends to appeal. *The statement may be combined with a motion for a new trial.*"[32]

Here, Mary's motion for new trial is entitled "Motion for New Trial." It is a three-page document that sets forth, paragraph by paragraph, the trial court's findings that Mary is

---

[30] *See In re Allstate County Mut. Ins. Co.*, 209 S.W.3d 742, 745 (Tex. App.–Tyler 2006, orig. proceeding) (noting the distinction between severance, which divides the lawsuit into two or more separate and independent causes, from bifurcation, which leaves the lawsuit intact but enables the court to determine issues at separate hearings, and concluding that the order entered after a separate trial is often interlocutory); *In re Ben E. Keith Co.*, 198 S.W.3d 844, 850 (Tex. App.–Fort Worth 2006, orig. proceeding) (also noting the distinction between a severance, which results in a final, appealable judgment, and an order for separate trials, which often results in an interlocutory judgment); *see also* TEX. R. CIV. P. 41 (authorizing severance); TEX. R. CIV. P. 174(b) (authorizing bifurcated trials).

[31] *See* TEX. R. CIV. P. 306c.

[32] TEX. FAM. CODE ANN. § 263.405(b) (emphasis added).

9

challenging.[33]  Although the motion is not entitled "Statement of Points," it clearly contains a "statement of the point[s]" on which Mary intends to appeal.  The trial court held a hearing on the motion.

"Section 263.405 was enacted in 2001 to reduce post-judgment delays and screen out frivolous appeals."[34]  Subsection (i) was added to section 263.405 in 2005 due to the legislature's displeasure with appellate decisions that allegedly undermined the legislature's intent in enacting subsection 263.405(b).[35]  The legislative history of subsection (i) reflects the legislature's goal of decreasing post-judgment delays:

> Compliance [with section 263.405(b)] as the Legislature intended, would correct any wrongs 30 days after trial, as opposed to extending reversals months or years after a trial.
>
> If a mistake is pointed out to the trial court that warrants a new trial, the trial court can immediately order a new trial, and the Legislature's goal to decrease post-judgment delays is accomplished.  Encouraging appellants to ignore the post-judgment procedures enacted by the Legislature in 2001, not only increases the amount of time that abused and neglected children spend in foster care, it bogs down the appellate courts with mistakes that could have been quickly and easily corrected at the trial level.[36]

---

[33] For example, paragraph two asserts ineffective assistance of counsel.  Paragraph three challenges the legal and factual sufficiency of the trial court's "finding that termination of the parent-child relationship was in the best interests of the child."  *See* TEX. FAM. CODE ANN. § 161.001(2) (Vernon 2008).  Paragraph four challenges the legal and factual sufficiency of the trial court's finding that Mary "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child."  *See id.* § 161.001(1)(D).  Paragraph 5 challenges the legal and factual sufficiency of the trial court's finding that Mary "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  *See id.* § 161.001(1)(E).

[34] *See In the Interest of R.J.S.*, 219 S.W.3d 623, 625 (Tex. App.–Dallas 2007, pet. denied).

[35] *See id.* at 626 (citing *In re D.A.R.*, 201 S.W.3d 229, 230 nn.1-2 (Tex. App.–Fort Worth 2006, no pet; *In re E.A.R.*, 201 S.W.3d 813, 815, n.2 (Tex. App.–Waco 2006, no pet.) (Vance, J., concurring)).

[36] *In re E.A.R.*, 201 S.W.3d at 815, n.2 (quoting HOUSE COMM. ON JUVENILE JUSTICE AND FAMILY ISSUES, BILL ANALYSIS, Tex. H.B. 409, 79th Leg., R.S. 2005, available at http://www.capitol.state.tx.us/cgi-bin/tlo/textframe.cmd?LEG=79&SESS=R&CHAMBER=H&BILLTYPE=B&BILLSUFFIX=00409&VERSION=2&TYPE=A.).

Courts must read a pleading for its content rather than its label.[37] Considering (1) the language of the statute permitting a statement to be combined with a motion for new trial, (2) the legislative goal of correcting mistakes quickly and decreasing post-judgment delays, and (3) the general rule of construction that requires us to look at the substance of a pleading rather than the title, we construe Mary's motion for new trial as including a statement of points, in satisfaction of the requirement of subsection 263.405(b).[38] Moreover, because Mary's motion for new trial raised the same issues she now raises on appeal, we may consider all of the issues Mary has presented in her appellate brief.[39] Having determined that section 263.405 does not bar our review of Mary's issues on appeal, we need not address Mary's arguments attacking the constitutionality of section 263.405.[40]

### III. SUFFICIENCY OF THE EVIDENCE

### A. Standards of Review

Involuntary termination of parental rights involves fundamental constitutional rights

---

[37] *See generally* TEX. R. CIV. P. 71; *State Bar of Tex. v. Heard*, 603 S.W.2d 829, 833 (Tex. 1980); *Johnson v. State Farm Lloyds*, 204 S.W.3d 897, 899 n.1 (Tex. App.–Dallas 2006), *aff'd,* 52 Tex. Sup. J. 1042, 2009 Tex. LEXIS 470 (Tex. July 3, 2009).

[38] *See, e.g., Fletcher v. Dep't of Family & Protective Servs.*, 277 S.W.3d 58, 64 (Tex. App.–Houston 2009, no pet.) (acknowledging that appellant did not file a statement of points, but finding that appellant satisfied the necessary requirements through his motion for new trial); *In the Interest of Z.J.C.*, No. 10-09-00026-CV, 2009 Tex. App. LEXIS 5628, at *3 (Tex. App.–Waco July 22, 2009, no pet. h.) ("Although not labeled as a statement of points, S.T. presented specific issues for review in her timely filed motion for new trial.").

[39] *See generally* TEX. FAM. CODE ANN. § 263.405(i) ("The appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points on which the party intends to appeal or in a statement combined with a motion for new trial.").

[40] *See* TEX. R. APP. P. 47.1. We note that in *In re J.O.A.*, the Texas Supreme Court recently held that (1) an ineffective assistance of counsel claim can be raised on appeal despite the failure to include it in a statement of points, and (2) section 263.405(i) is unconstitutional as applied when it precludes a parent from raising a meritorious complaint about the sufficiency of evidence supporting a termination order. *In re J.O.A.*, 283 S.W.3d at 339.

and divests the parent and child of all legal rights, privileges, duties and powers normally existing between them, except for the child's right to inherit from the parent.[41] Termination must be supported by clear and convincing evidence.[42] This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings.[43] It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[44]

To terminate parental rights, the trial court must make two findings. First, the parent must have committed one of the acts prohibited under subsection 161.001(1) of the Texas Family Code, and second, the termination of parental rights must be in the child's best interest.[45] Here, the trial court found that the Department had proven by clear and convincing evidence that Mary had (1) knowingly placed or knowingly allowed T.J.H. to remain in conditions or surroundings which endangered his physical or emotional well-being; and (2) engaged in conduct or knowingly placed T.J.H. with persons who engaged in conduct that endangered T.J.H.'s physical or emotional well-being.[46] The trial court also found that the termination of Mary's parental rights was in the best interest of T.J.H.[47] On

---

[41] *Holick*, 685 S.W.2d at 20.

[42] *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re D.S.P.*, 210 S.W.3d 776, 778 (Tex. App.–Corpus Christi 2006, no pet.).

[43] *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.–Fort Worth 2006, pet. denied).

[44] EX. FAM. CODE ANN. § 101.007 (Vernon 2008).

[45] *Id*. § 161.001(1)-(2).

[46] *Id*. § 161.001(1)(D), (E).

[47] *Id.* § 161.001(2).

12

appeal, Mary argues that all of the trial court's findings are supported by legally and factually insufficient evidence. Our review of Mary's sufficiency challenge is guided by the Texas Supreme Court's opinion in *In re J.F.C.*, wherein the court stated:

> In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. This does not mean that a court must disregard all evidence that does not support the finding. Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.

> . . . .

> In a factual sufficiency review, . . . a court of appeals must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. . . . [T]he inquiry must be whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. A court of appeals should consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of the finding.[48]

### B. The Evidence

#### 1. Stan Smith's Testimony

Stan Smith is principal and director of the school that T.J.H. attends. As of the date of the termination hearing, T.J.H. had been attending the school for approximately two

---

[48] 96 S.W.3d 256, 266-67 (Tex. 2002) (footnotes and internal quotations omitted).

years, as a kindergarten and first-grade student. D.H. was also a student at the school.

It was Smith's understanding, based on conversations with T.J.H., D.H., and Mary, that T.J.H. had been sexually abused when he was living with his biological father, Bob. T.J.H. told Smith that Bob "had forced he and his sister to watch some pornographic movies or T.V. or something of that nature[,] and then he would be required to perform pornographic behavior on his sister, her on him, and the two of them on the father." While T.J.H. was in kindergarten, Smith concluded that both T.J.H. and D.H. were emotionally disturbed, and he discussed with Mary his belief that "there was a very great need for [the children] to get counseling." He also told Mary that, in light of the anger exhibited by the children, she should take them to "a doctor and see if they didn't need some medication to help them get through school." During these discussions, Mary expressed concern over the financial cost of counseling and questioned whether hospitalization was more appropriate then counseling. Smith did not know if Mary had acquired counseling for the children prior to the Department requiring her to do so.

D.H. made a number of outcries to Smith, some of which prompted him to contact CPS. D.H. complained that she was denied food at home as punishment for bad behavior. On some Monday mornings, D.H. would come to school appearing "ravenously hungry." Smith also described some of D.H.'s outcries as follows:

> Frequently she would come into school and complain that she had been knocked by her mother, you know, she said her mom would slap her in the face and knock her up against a wall and that that would hurt her head, and that if she used bad language, she was forced to drink vinegar. You know, [D.H.] described a situation that appeared to be pretty rough at home.

T.J.H. also made outcries to Smith. In one outcry, T.J.H. told Smith that Mary had driven him and D.H. to a park in the middle of night ("the park incident"). Mary threatened

14

to abandon the children at the park and told them "that if something bad happened, that was just the way it was going to be." Moreover, T.J.H. would describe to Smith "being hit if he did not behave." According to Smith, "The physical stuff didn't seem to bother [T.J.H.], but he would come in and tell us he was being called names." On one occasion, Smith saw T.J.H. with a gash on his head that had been sutured. Upon questioning from Smith, T.J.H. stated that he had gotten into an accident and that Mary had stitched the wound herself because she did not want CPS to get involved. Smith acknowledged at trial that Mary is a licensed vocational nurse and that he did not believe she or anyone else was responsible for the gash on T.J.H.'s head.[49]

While T.J.H. was in kindergarten, Smith saw him at least two or three times a week for disciplinary reasons. Though the school traditionally did not suspend kindergarten children for bad behavior, T.J.H.'s "behavior was so out of control" that he was suspended on at least three occasions. Smith elaborated on some of T.J.H.'s outbursts at the hearing, stating:

> And in kindergarten on at least two occasions, . . . [T.J.H.'s] behavior was so out of control that I had to physically restrain him once for almost two hours because he was trying to run out in the street and he was telling us at that time that he really didn't care if he got hit by a car and killed; he just did not care. And we had to hold him because he was kicking—he had kicked me; he had kicked another teacher; he was trying to kick and hit children because he was so angry. . . .
>
> And there was another occasion when [T.J.H.] was—he almost literally tore my office apart when he had been referred. And we had to physically restrain him but not for as long that time.[50]

---

[49] Anastasia Gonzales, a CPS investigator, would later provide testimony on this matter. According to Gonzales's testimony, T.J.H. told her that Mary applied sutures to his head after he cut it by running into a glass bowl.

[50] Smith gave additional testimony about the time he physically restrained T.J.H. for nearly two hours, stating:

15

On the morning of August 22, 2005, the date of the belt incident, an educator at the school notified Smith of injuries found on T.J.H. Upon seeing T.J.H., Smith observed what appeared to be injuries. T.J.H. informed Smith that his step-father, Harry, had hit him with a belt and belt buckle. Smith then reported T.J.H.'s injuries to CPS and the police department. He also contacted Mary, who picked up T.J.H. from school to take him to the police department and a hospital. After Mary picked up T.J.H. from school, educators informed Smith that Mary, upon arriving at the school, primarily expressed concern over her job, rather than T.J.H.'s injuries. Smith believed that Mary exhibited concern, as well as "anger and frustration," when she picked up T.J.H. from the school.

Prior to Mary's arrival, Smith took pictures of T.J.H.'s injuries, which were used as evidence at Mary's termination hearing. The pictures, as described by Smith, revealed "a blow to [T.J.H.'s] ear and temple on the right side, "a blow on the back of the legs," "two different marks, maybe three, from a belt on his back on the left side," and "a blow on his chest on the left side and looks like it could have been made by a belt."

When the Department removed T.J.H. from Mary's custody and placed him with a foster family, he continued to attend the same school. Smith had this to say about T.J.H.'s behavior after his removal from Mary:

> [T.J.H.'s] behavior was much improved after he was placed in foster care. He is still not an angel by any means, but his behavior was much more normal and it was the kind of thing that a teacher could handle by calling the parents and work out rather than having to send them to the office. He still

There was one time when something had happened, and it was around the time when he had been told he was going to be put out in the [park] or something, he was so angry that he had hit some kids and we couldn't get ahold of anybody. I sat in a chair . . . . And I held him the way you're supposed to hold them. And I would try to let him go and I'd say, "[T.J.H.], I just want to let you go. Will you just sit there 'til someone gets here?"

And he'd, [sic] "No, I won't. I'm going to run away." And a couple of times that I tried to let him go while I had somebody at the doorway and he went running for the door.

16

had some minor—"minor" meaning he had to go to Saturday school or have some consequences, but I don't think we had to suspend [T.J.H.] and, as far as I recall, we did not have to physically restrain him at all during the first grade.

Aside from T.J.H.'s improved behavior, Smith also observed that, since his removal from Mary, T.J.H. has been "more able to show his potential to learn," and is "now making mostly 'A's as a first-grader." But what Smith has "noticed the most is that [T.J.H.'s] behavior and his expression of being happy is much more improved now." When questioned as to whether T.J.H.'s behavioral improvement was attributable to the medicines he began taking after his removal from Mary, Smith credited the change in parenting for the improvement, stating:

> When [T.J.H.] went into foster care in August and came back to school with us, I made it a point to go and talk to him . . . . And I asked [T.J.H.] how he felt. And the first thing he said to me was, "There's always something to eat. They don't cuss at me, and I never want to go back home." And we saw almost from the beginning a good change in [his] behavior. And I don't think he was on any medication at that time. I think later he saw a doctor and was put on medication. But I can't tell you I honestly know exactly when he started. What I saw as a change in behavior was the parenting.

### 2. Cynthia Black's Testimony

Cynthia Black, a teacher, was the first adult at the school to notice T.J.H.'s injuries from the belt incident. On that day, Black was on breakfast duty, where she was watching the children as they ate their breakfast. T.J.H. approached her and told her that he was unable to hold onto an item, which was not identified at the termination hearing. Black asked T.J.H. why he couldn't grip the item, and he showed her his hands. Black saw that his hands "were swollen and they had marks across the inside of the hands and on the outside of the hands." T.J.H. told Black that he received the injuries to his hands while trying to block his face from being hit with a belt. He identified his stepfather, Harry, as the

17

person who was trying to hit him with the belt. Black then observed what appeared to be an injury on the side of T.J.H.'s face. T.J.H. told Black that he had other injuries, which were later examined by another educator. Black immediately notified Smith about T.J.H.'s condition.

Black recalled one incident prior to the belt incident, in which she contacted Smith to discuss T.J.H. being hit. She also recalled T.J.H. outcrying to her that he was not always fed supper on the weekends, "so on the days that he would come [to school], he would always eat, like, two or three breakfasts."

### 3. Anastasia Gonzales's Testimony & Affidavit

Anastasia Gonzales is a CPS investigator with the Department. On August 22, 2005, Gonzales was assigned to investigate the belt incident. On this day, Mary was contacted at work about T.J.H.'s injuries, and she was instructed to pick up T.J.H. from school so he could be given medical attention. Mary and Harry both went to the school to get T.J.H. A law enforcement authority directed them to immediately take T.J.H. to the police department. It was at the police department that Gonzales met T.J.H., Mary, and Harry. T.J.H. was later taken to a clinic and then directed to a hospital. Upon seeing T.J.H., Gonzales observed a bruise extending from his ear to his cheek, a circular bruise on his abdomen, and three or four other markings on his abdomen. T.J.H. told Gonzales that Harry had hit him with a belt earlier that morning. In an affidavit, Gonzales described her conversation with T.J.H. and the injuries she observed as follows:

> [T.J.H.] indicated that he was spanked this morning for having the TV plugged in when he was not supposed to because he was grounded. He stated that his sister, [D.H.], plugged it in and he didn't. He reported that this morning he was asleep and he awoke by the sound of his father's voice yelling at him and he said he could not understand what he was saying. [T.J.H.] stated that his father started to "shake on him" and began spanking

18

him with the belt. He claimed that his mother . . . was at work when the incident occurred this morning. [T.J.H.] also stated that Harry has hit him and his sister . . . with the belt on other occasions. [T.J.H.] explained that his stepfather would drink beer and "get crazy" when he drank. . . . During the interview I observed [T.J.H.] to have injuries to his face, chest, leg, and abdomen. The bruise on his cheek was light purple. There was a red oval-shaped mark on his chest. There was also a red mark on the side of his abdomen that appeared to wrap around his body. He also had a cut on his finger and on his wrist in which he said that the belt hit him while his hands were down.

Gonzales believed T.J.H.'s bruises were the product of abuse, rather than normal discipline. Gonzales spoke with Harry at the hospital. Harry denied hitting T.J.H. with a belt and stated that he believed the injuries stemmed from T.J.H. falling off a coffee table while fighting with D.H. the previous day.

Gonzales also spoke with Mary, who stated that she did not know where T.J.H.'s injuries came from. Mary said she did not know of the injuries when she left for work at 5:45 a.m. that morning. According to Gonzales, Mary's statements to her contradicted an earlier statement that Mary had made to a doctor that was treating T.J.H.; Mary told this doctor that T.J.H.'s injuries stemmed from Harry hitting him with a belt. Mary told Gonzales that she had left bruises and marks on T.J.H. in the past after disciplining him, but she was not responsible for the markings now found on his body. Mary expressed her belief that T.J.H. did not require medical attention. Gonzales got the impression that Mary was more concerned about her job than she was about T.J.H.'s injuries. Mary appeared angry about having to leave work; she told Gonzales that she had to get a coworker to cover her job duties. Mary appeared angry and "furious" at T.J.H., and she was inconsiderate of his feelings. T.J.H. appeared scared in Mary's presence; he told her that "it wasn't his fault." Mary did not hold T.J.H. at the hospital. Gonzales believed that Mary was agitated and inconsiderate towards everyone around her. In her affidavit, Gonzales details Mary's

19

behavior and conversations she had with Mary, as follows:

> [Mary] was observed to be very upset for having to leave work; she stated that she was, "losing out of work because she was demanded to leave." While at the police station, [Mary] was heard telling [T.J.H.] that he "should be in school learning, not here at the police station." When asked to have [T.J.H.'s] injuries checked by a doctor, she replied, "You do not get internal injuries from the scrape." [Mary] indicated that CPS had already investigated her in the past for the stitches she applied to her son's head and nothing was done. She claims to be a skilled nurse. While at the police station she was pacing around in the front lobby and seemed to worry more about losing her job. . . .

> . . . While a doctor was examining [T.J.H.], [Mary] indicated that this morning his stepfather hit [T.J.H.] with a belt. She also indicated that she disciplined [T.J.H.] as well with the belt and admitted to leaving [T.J.H.] marked and/or bruised when she has disciplined him with a belt.

> [Mary] was asked if she had any family members that would be able to take care of [T.J.H.] for a while. [Mary] claimed she did not have any family that would help her and refused to leave [T.J.H.] with her mother. She stated that in the past when her mother did take care of [T.J.H.], he would return home with bruises that resulted from being disciplined by [Mary's] mother.

T.J.H., either on August 22 or a later date, told Gonzales that Mary had hit him on numerous occasions. T.J.H. also told Gonzales that Harry had once handcuffed him to a door. T.J.H. stated that Harry has handcuffs because he works at a prison and that Harry handcuffed him because Harry wanted T.J.H. to know how it felt. According to T.J.H., Harry was angry with him when the incident occurred.

Gonzales was assigned to T.J.H.'s case for one or two months. Though the Department ordered Mary to pay child support for T.J.H. to cover the time he spent in the Department's care, Mary did not pay any support while Gonzales was assigned to the case. Gonzales did not know whether Mary or Harry complied with the Department's directives after her assignment ended. Gonzales was aware, however, that Mary and Harry had been making efforts to comply; these efforts included Mary and Harry attending

20

counseling services as instructed by the Department.

On October 24, 2005, a family service plan was made for Mary and Harry. The plan's long-range goal for T.J.H.'s permanency was family reunification. The plan instructed Mary and Harry to satisfy certain objectives; these objectives did not include staying away from each other. The plan changed when Harry was indicted for injury to a child as a result of the belt incident. In connection with that incident, the Department validated that Harry had abused T.J.H. To Gonzales's knowledge, Mary was still living with Harry, and she had made no efforts to leave him. Gonzales testified that she would be worried if T.J.H. was returned to both Mary and Harry, stating: "[Mary] has in the past provided an unsafe environment for her child and I do not feel that she would be protective of [T.J.H.]."

Gonzales's affidavit outlined the history of involvement CPS has had with T.J.H. and his siblings, V.H. and D.H. The children's CPS history, prior to the belt incident, consisted of 22 referrals: ten referrals contained no disposition; five referrals were "reason to believe"; four referrals were "ruled out"; one referral was "administratively closed"; one referral was "unable to determine"; and one referral concerned D.H.'s outcry of sexual abuse against Bob (D.H.'s step-father and Mary's ex-husband).[51] Of the five referrals with the disposition "reason to believe," only two of them involved Mary.

The first of these two referrals was dated September 1998, which is five months prior to T.J.H.'s birth. In this referral, the Department found there was "reason to believe" that Mary had been physically abusive to V.H. and D.H. The allegation in the referral states: "Young children were slapped and kicked by two adults. Children at times

---

[51] *See generally* 40 TEX. ADMIN. CODE § 700.511 (2004) (listing and defining the various dispositions that the Department's caseworkers may make regarding an investigation).

appeared to be fearful. Both were adults out of control with children." The young children were V.H. and D.H., and the two adults were Mary and her mother, Johann. The allegations of physical abuse against V.H. and D.H. were "reason to believe" as to Mary, and "ruled out" as to Johann.

In the second referral, the Department found there was "reason to believe" that Mary had been physically abusive towards T.J.H. The referral, dated February 2003, concerns allegations that Mary was physically and emotionally abusive to T.J.H. The allegations consisted of Mary handling T.J.H. roughly (e.g., Mary "picked [T.J.H.] up and sat him down very hard in a chair"); slapping and threatening T.J.H. with physical punishment even though he was "not out of control in [his] behavior or even disruptive"; and using foul or insensitive language with T.J.H. (e.g., "shut up"; "beat your goddamn ass").

### 4. Mary's Testimony

After CPS first became involved in the lives of Mary and her children in 1997, the Department had Mary sign a contract in September 1998, wherein she promised not to spank her children or engage in other forms of "inappropriate discipline." Mary continued to spank her children after entering the agreement, but she did not view her discipline as abuse at the time. In November 1998, Mary was given a family service plan, which directed her to not engage in any type of discipline that involves verbal abuse or results in bruising or marks to the children's bodies. Some of the service plans involving Mary's children stemmed from Mary taking the blame for injuries to her children that she did not commit. The physical and emotional abuse inflicted onto her children was not caused by Mary, but was instead caused by Mary's then-husband, Bob.

Bob physically, sexually, and emotionally abused Mary. Though Mary was aware

of the physical and emotional abuse Bob inflicted on the children, she did not leave him because she thought they would be in more danger if she did. On multiple occasions, Bob threatened to kill Mary and the children if they ever left him. Mary, however, did not know of any sexual abuse Bob was inflicting on the children.

One day, Mary glimpsed what appeared to be inappropriate contact between D.H. and Bob. Mary then privately questioned D.H. about what Bob had been doing with her, at which point D.H. outcried about Bob's inappropriate contact with her. The following day, Mary took D.H. to the authorities and removed herself and the children from Bob. Bob was subsequently imprisoned and divorced from Mary.

With Mary and the children now separated from Bob, D.H. began attending counseling services. Counseling was not considered for T.J.H. because there was no suggestion that he had been sexually abused by Bob. Mary still made T.J.H. available for counseling, but Mary was told that he was too young for counseling or to be medicated. It was not until months later that T.J.H. began engaging in behavior indicating that he had been sexually abused.

At the termination hearing, the Department suggested that Mary had reason to believe that Bob was (or, alternatively, was capable of) sexually abusing her children early on in their relationship. Mary denied the existence or significance of events that the Department sought to portray as warning signs of Bob's deviant, sexual behavior. Mary conceded she was aware of Bob's practice of walking around nude in front of the children. Mary vocalized to Bob her problems with this behavior, but she once again felt she could not remove herself and the children from Bob because of his threats against them.

Mary does not believe Harry hit T.J.H. with a belt on the day of the belt incident, and

23

she has not separated from Harry because the family service plan calls for both of them to attend counseling services. Mary denied telling T.J.H.'s doctor—as if she believed it to be a fact—that Harry hit T.J.H. with a belt. Rather, she only told the doctor that T.J.H. was at the hospital because there was an *accusation* that Harry hit T.J.H. with a belt. Moreover, Mary revealed at the termination hearing that, when T.J.H. was removed from her care, she was against him being placed with her mother because her mother had a history of bruising him.

Mary argued that T.J.H. should be returned to her because she removed herself from Bob and she and Harry have been receiving services since T.J.H. entered the Department's custody. At the time of the termination hearing, Mary and Harry were receiving counseling services from a therapist named Mary Ann Johnson; the therapy sessions had been ongoing for the past four or five months. Mary and Harry began seeing Johnson soon after their counseling sessions with another counselor, Steve Bain, terminated. Mary conceded her failure to pay child support to the Department as directed; she maintained, however, that financial difficulties kept her from making payments and that she was fully prepared to pay the full amount owed on the day of her hearing.

### 5. Debra Sublett's Testimony

Debra Sublett, a licensed professional counselor, counseled T.J.H. and his older sister, D.H. Sublett began counseling D.H. in May 2004, when D.H. was eight years old. The record is unclear as to how often or for what span of time Sublett counseled D.H. At the time Sublett began counseling D.H., D.H. had "[l]ots of anger, aggression, acting out behaviors in the school system, defiance, problems attending to school, problems with school work, lots of anxiety, some depression, [and] fears." Sublett believed that D.H. had

24

been exposed to harmful behavior, a conclusion she reached based on D.H.'s behavior during counseling. Sublett detailed some of D.H.'s behavior at Mary's termination hearing:

> [D.H.] would frequently act out—as in our playroom, we have calm toys like families and animals. We also have aggressive toys such as knives, handcuffs, swords, those kind of things. She would frequently grab the toy guns, the toy knives, put guns to her head, say, "I'm going to blow my head off because I'm no good." She would frequently put a knife to her throat, a toy knife, say, "I'm going to die. I know I'll die."

In September 2005, approximately one month after T.J.H. was removed from Mary's care, Sublett began counseling T.J.H. weekly; the record indicates that these weekly meetings were still ongoing at the time of Mary's termination hearing. Sublett testified about the behavior and self-esteem T.J.H. exhibited when she first began seeing him:

> When we begin, lots of anger, lots of aggression toward himself and other children; very low self-esteem, very negative attitude toward himself. He would frequently say things such as "I'm stupid. I'm no good. I hate everybody; everybody hates me." He would be defiant; in the playroom, itself, in the sessions, very aggressive with the toys, very aggressive play. He would set up the toys and then he would be thrilled with the idea that they're going to all be killed, and those are his quotes, "killed." Repeatedly just anger and aggression. I have a punching bag we use sometimes in therapy and he would repeatedly beat this bag and just get very, very, angry, very animate [sic] when he was beating it saying, "Take this. You take this." So those kind of things.

Sublett did not believe that T.J.H. was engaging in age-appropriate behavior. She believed that T.J.H. had been exposed to behavior that was "very harmful" to his emotional well-being.

Sublett testified that, while counseling with T.J.H. and discussing his biological home with him, T.J.H. "would sometimes say things such as 'I don't like it when bad words are said like 'stupid' and 'shut up.''" Sublett did not testify whether T.J.H., in making those statements, credited Mary or Harry as the ones using the words he did not like. According to Sublett, T.J.H. would not speak of Mary or Harry at counseling; Sublett would attempt

25

to discuss his home life, but "[T.J.H.] would always generally completely shut down. He didn't want to talk."

### 6. Deborah Black's Testimony

Deborah Black works for the Women's Shelter of South Texas; she is a visitation coordinator, which requires her to supervise parent-child visits. Black was in charge of supervising visits between Mary and T.J.H. The visitation arrangement allowed for Mary to visit with T.J.H. once every two weeks, for two hours. Black supervised eighteen visits. The first visit occurred on October 7, 2005, and the last scheduled visit was for June 16, 2006—three days before Mary's termination hearing began.

Mary was consistent on attending her scheduled visits. Only two scheduled visits were canceled, and both of these cancellations were due to the foster family not bringing T.J.H. to the visit location. When the visits first started, T.J.H. was very reluctant to visit with Mary, but T.J.H. grew more comfortable once Black further introduced herself to T.J.H. and explained to him that he had the power to end the visit at any time. There were times at the visits when T.J.H. became "distressed," but this typically occurred when Mary would start to cry. Black explained that "[i]f [T.J.H.] sees . . . that [Mary's] relaxed, then he's usually a little bit more relaxed and more open in the visits." As the visits continued, T.J.H. became more relaxed "[t]o some degree."

On the date of the last scheduled visit, Black received a call from Ronald, T.J.H.'s foster parent. Ronald informed Black that T.J.H. did not want to attend the visit. Black directed Ronald to bring T.J.H. to the visit location. When T.J.H. arrived, Black asked him why he did not want to visit with Mary. T.J.H. explained that he did not want to see her upset. T.J.H. began to worry that Mary would be upset after he had a recent conversation

with Ronald.  Black explained the substance of that conversation at the hearing:

> Well, [Ronald] and his wife had talked to [T.J.H.] to make him aware of the termination hearing.  They talked to him about the possible outcomes.  So [T.J.H.] knew that there was a hearing today and he knew kind of, basically, what was going to happen; that, you know, that either his mother was going to get him back or that her rights were going to be terminated.  I'm not sure he understood everything.  But he was afraid his mother would be upset because the hearing was so close.  At least, that's my take on it.

Black explained the situation to Mary.  Mary wanted to speak with T.J.H., and Black allowed her to do so.  In the presence of Black, a caseworker, and Ronald, Mary informed T.J.H. that this visit could be the last time she was able to see him.  Mary was crying, and she asked T.J.H. to visit with her.  T.J.H. stated that he did not want to visit.  Mary grew more emotional; she began pleading with T.J.H. to visit with her.  After T.J.H. repeated that he did not want to visit, Black ended the meeting.

### 7. Ronald's Testimony

Ronald and his wife have been T.J.H.'s foster parents since August 2005—the month T.J.H. was removed from Mary's care.  Along with T.J.H., Ronald and his wife have five children: two biological children and three foster children.  When T.J.H. came into their care, T.J.H. required immediate dental work; this consisted of fillings and a tooth extraction.  T.J.H. was uncomfortable and unruly when he first joined his foster family, but his comfort and behavior has improved with time.  On one occasion, T.J.H. told Ronald that he has had his "ass whipped."  The record contains no additional details regarding what exactly T.J.H. was referring to when he made that statement.

After a few months of living under his foster family's care, T.J.H. was hospitalized for eighteen days after exhibiting aggressive behavior towards others; this behavior involved T.J.H. hitting students and teachers and expressing increased outrage at home.

27

It is unclear how long T.J.H. was living in his foster family's home prior to his hospitalization; at Mary's termination hearing, T.J.H.'s hospitalization is only described as being "recent." Prior to his hospitalization, T.J.H. was taking two behavioral medications. After his hospitalization, T.J.H. was given five additional medications for his behavior. Together, these medications are intended to help with Attention Deficit Hyperactivity Disorder, mental and mood disorders, depression, and anger control.

According to Ronald, T.J.H. has expressed a desire to remain with him and his wife and to not return to Mary. With regard to Mary's last scheduled visit with T.J.H., Ronald stated that T.J.H. did not want to visit with Mary because he did not want to see her cry or frustrated. At the time of the termination hearing, Ronald and his wife had not discussed adopting T.J.H.

### 8. Pamela Campbell's Testimony

Pamela Campbell is a caseworker for the Department; she was the caseworker assigned to T.J.H. at the time of the termination hearing. Campbell believes that Mary has endangered T.J.H. and that the termination of Mary's parental rights is in T.J.H.'s best interest. Campbell's belief is predicated on what she knows about Mary's history with the Department, as well as Mary's recent interaction with T.J.H. As explained by Campbell at the hearing:

> [W]hen [Mary] comes to the visits with [T.J.H.], and he is a hyperactive child; there's no question about that. As long as they're playing board games or doing things together like that that's quiet, they have a real good rapport and they do well. When [T.J.H.] gets up and begins to bounce around, it agitates her and upsets her. So, you know, I'm not sure that she can deal with a child with this behavior. I think that probably in the past with my experience with these children that have A.D.H.D. that they do provoke the parents. And that causes a lot of these problems.

Campbell, however, never saw any of Mary's visitations with T.J.H.; her take on Mary's

28

behavior during visitation was attributable to reports others in the Department had made. Altogether, Campbell met with T.J.H. three times, talked on the phone three times with Mary, and met with Mary one time out of court.

Campbell explained that Mary's family service plan had to be changed from reunification to termination when Harry was indicted for injuring T.J.H. because "[Harry] is not allowed to be around [T.J.H.] as long as he's been indicted." Campbell stated that a new service plan was not drafted when the Department abandoned its reunification goal. Campbell notified Mary over the phone that the Department had adopted a new service plan, but she failed to inform Mary that she should separate from Harry under this plan. The only difference between the old plan and the new plan was that reunification was not being sought; the services that Mary and Harry were expected to complete under the old plan still remained under the new plan. As explained by Campbell at the hearing: "We do that because, in case we do not get termination and [T.J.H.] goes home, [Harry] still has to have those services. If he doesn't—if he's not convicted and they remain together, he still has to have these services. We believe it's in [T.J.H.'s] best interest."

### 9. Alice W.'s Testimony

Alice W. is a teacher who instructed T.J.H. when he was in kindergarten and under Mary's care. Alice had no nutritional concerns relating to T.J.H., explaining that T.J.H. was "[a]lways very clean, well-groomed, nutritionally had snacks." Alice described him as a very bright, creative, and expressive child; a strong reader; a capable student; and one prone to unexplained outbursts of anger. During these outbursts, T.J.H. would at times get physical with other children, flip his desk over, or had to be physically restrained. Alice revealed discussions she had with T.J.H. when he was her student. She recalled him

29

telling her about Mary applying sutures to his head, and one occasion in which he told her that Mary had called him an "idiot." Alice, who still sees and communicates with T.J.H. in the school hallways now that he has progressed to another grade level, testified that he "seems very cheerful and bouncing and hopping along as he goes down the hallway; [he] seems very, very content; very happy."

Alice also testified about her interaction with Mary while T.J.H. was one of Alice's students, stating:

> [Mary and I] worked very, very closely. We had a very open relationship. We talked numerous times. Sometimes—I would say initially at the beginning, we talked maybe every week to every ten days and felt very comfortable about calling Mary and she, I felt like, would return calls from work or wherever she was at the time and came in for some regular teacher-parent conferences and very, very open communication. Our regular scheduled conferences that we had middle of the year and end of the year, she attended those and, yes, we worked very closely together.
>
> . . . .
>
> I felt very comfortable picking the phone up and calling her on every occasion, any occasion. She was helpful; in that she provided some little holiday treats for our children, our class, the whole class. [T.J.H.] was very proud of that. That meant a lot to him. For lots of occasions. They . . . I just—I always felt like I could talk very openly to her and we had a—say mother-mother but a mother-mother-teacher relationship where I felt like I could talk to her and tell her that *I'm very, very concerned; the hostility and the anger is there*.[52]

### 10. Joe's Testimony

Joe is D.H.'s biological father. To Joe's knowledge, Mary never placed D.H. in counseling until she was ordered by the State, and then she failed to fully follow through with it. Joe credits Mary for removing D.H. from Bob, who sexually abused D.H., stating: "I know when she found out one hundred percent sure, she went straight down to sheriff's

---

[52] Emphasis in original.

30

department and started."

At the time of Mary's termination hearing, Joe had custody of D.H. Mary was allowed to have supervised visitation. The last time Mary visited with D.H. was in March 2006. After that time, Joe stopped complying with the visitation agreement because the individual in charge of the visitation would fail to supervise for the full duration of the visit.

Joe testified that D.H. has complained to him about being hit, being called derogatory names, and not being fed regularly while living with Mary. D.H. also complained about T.J.H. being hit. Joe did not elaborate on D.H.'s complaints.

### 11. Steve Bain's Testimony

Steve Bain, a licensed professional counselor for the State of Texas, testified that he began meeting with Mary and her current husband, Harry, in late-September 2005 (a little less than two months after the Department took possession of T.J.H.). In the course of seven or eight meetings, with each meeting lasting approximately thirty-five to forty-five minutes, Bain either met individually with Mary or Harry, or he met with both of them together. A job change forced Bain to stop meeting with Mary and Harry in November 2005. While the meetings were taking place, however, Bain became concerned that T.J.H. was not safe under Mary's care because of anger management issues that surfaced in his conversations with Mary. Bain performed a test on Mary, referred to as a State-Trade Anger Expression Inventory (STAXI-2), the results of which, according to Bain, "indicate[d] that [Mary] both suppresses extremely intense angry feelings and then expresses them in aggressive ways." Bain could not state an opinion as to whether Mary could learn to better control her anger because he did not spend enough time evaluating her.

### 12. Mary Ann Johnson's Testimony

Mary Ann Johnson, Mary's only witness, is a licensed professional counselor. Mary and Harry began meeting with Johnson in February 2006 for the purpose of satisfying the Department's family service plan. Mary and Harry had previously been meeting with Steve Bain. From February 2006 to the present, Mary and Harry have actively and consistently pursued Johnson's counseling services, meeting with her once every week. The counseling involves learning how to establish family values and morals. Johnson believes that Mary's and Harry's attitudes have improved as the counseling has progressed, stating: "I think they've learned to be more open, a little bit more comfortable. It's far from where it needs to be, but I think we're going in the direction it needs to be given the amount [of] time. . . . I can't say they haven't been cooperative or compliant or haven't done anything I've asked them to do."

The bulk of Johnson's information about T.J.H.'s and the Department's history with Mary has come from Mary herself. With regards to Mary, Johnson had this to say at the termination hearing:

I think Mary is—I think she has a strong mother bond to her child. I think Mary has quite a few shortcomings and I think she has, I'll say, some blinders on I think that prohibit her or kept her from being—from anticipating problems that have come to—you know, that's why we're here I think.

Based on her conversations with Harry, Johnson believed that Harry and T.J.H. were beginning to form a relationship when T.J.H. was placed in the Department's custody, stating:

I get the sense or the impression that [T.J.H.] and [Harry] were forming a relationship. . . . [Harry] speaks very fondly of [T.J.H.]. Numerous times he feels this burden about what to do with—for [T.J.H.] and for Mary. So I get the sense that he really is—doesn't know what to do to resolve this issue.

But going to the relationship with [T.J.H.] is that it was in formation. [Harry] is an experienced parent. He has two children of his own and they're

32

almost grown. One is 18 and the other is 14, I believe. So he has some of those experiences to draw from, to share with someone who is much younger . . . .

Johnson believes that there is a need for Mary, Harry, and T.J.H. to be in counseling together. If this were to happen, Johnson believes the potential for improvement is "more than good," explaining: "It will depend on the commitment of Mary and [Harry] . . . . But I think that what they've shown to me at least in the last few months is that they are committed now in the counseling and have asked for it recently again. So I'd say more than good." When questioned as to whether she would support a recommendation that Mary, Harry, and T.J.H. be reunited with the condition that they continue with counseling together, Johnson stated she would feel comfortable in joining that recommendation.

### C. Subsection 161.001(1)(E)

Mary argues that the evidence was legally and factually insufficient to support a finding of endangerment under subsection 161.001(1)(E), which authorizes a court to terminate a parent-child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the child's physical or emotional well-being.[53] The Texas Supreme Court has defined "endanger" to mean exposing a child to loss or injury, or jeopardizing a child's emotional or physical health.[54] While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child

---

[53] TEX. FAM. CODE ANN. § 161.001(1)(E).

[54] See Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987).

actually suffer injury.[55]

Under subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical and emotional well-being was the result of the parent's conduct, including acts and omissions.[56] To be relevant, the conduct does not have to have been directed at the child nor must actual harm result to the child from the conduct.[57] Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required.[58] The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct.[59]

Considering only the evidence that tends to support the trial court's finding, we find the trial court could have reasonably decided that Mary engaged in a course of conduct that endangered T.J.H.'s physical or emotional well-being. The trial court could have found that T.J.H.'s physical well-being was endangered based on (1) the CPS referral containing a reason-to-believe disposition that Mary had been physically abusive with V.H. and D.H.;[60] (2) the CPS referral containing a reason-to-believe disposition that Mary had been physically abusive with T.J.H.; (3) D.H.'s outcry that Mary had knocked her up against a

---

[55] *Id.*

[56] *Castaneda v. Tex. Dep't of Protective & Regulatory Servs.*, 148 S.W.3d 509,522 (Tex. App.–El Paso 2004, pet. denied).

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] A finding of parental conduct endangering a child may also be based on the parent's conduct with regard to the child's siblings prior to the child's birth. *See, e.g., Dallas County Child Protective Servs. Unit v. Bowling*, 833 S.W.2d 730, 733-34 (Tex. App.–Dallas 1992, no writ) (determining that sexual abuse of oldest son before birth of child in question was evidence of course of conduct that endangered younger child).

34

wall, hurting her head; (4) Mary's failure to protect T.J.H. and D.H. from Bob's physical abuse prior to D.H.'s outcry of sexual abuse; and (5) Mary's decision to continue living with Harry after the belt incident. Moreover, the trial court could have found that T.J.H.'s emotional well-being was endangered based on the following evidence: (1) the CPS referral that contained a "reason to believe" allegation that Mary was emotionally abusive with T.J.H.; (2) Mary's use of derogatory language against D.H. and T.J.H.; (3) Mary's behavior on the night of the park incident; (4) Mary's behavior towards T.J.H. on the day of the belt incident; and (5) Mary's failure to provide T.J.H. with the counseling services offered to him.[61]

After considering the record as a whole, we further conclude the evidence is more than sufficient to show that the trial court, as factfinder, could reasonably form a firm belief or conviction that Mary engaged in conduct dangerous to the children's physical or emotional well-being. Though Mary's and Harry's attendance of family counseling services is relevant to rebutting the trial court's finding of endangerment,[62] the evidence of improved conduct does not conclusively negate the probative value of the laundry list of irresponsible choices and behavior that support the trial court's finding. Thus, the evidence is factually sufficient to support the trial court's finding. Because the evidence is legally and factually

---

[61] Mary's failure to provide T.J.H. with counseling services that were readily available to him is arguably the most emotionally endangering conduct in which Mary engaged. In *In re M.C.*, the Texas Supreme Court recognized that physical neglect is just as dangerous as direct physical abuse. *In re M.C.*, 917 S.W.2d 268, 269-70 (Tex. 1996). In the instant case, we are presented with a case of *emotional* neglect, which we believe can be just as dangerous as direct emotional abuse. Mary emotionally neglected T.J.H. when she failed to place him in counseling. The evidence showed that Mary was aware, prior to T.J.H.'s removal, of the sexual abuse he had endured by Bob. One can easily infer that this abuse has had a damaging impact on T.J.H.'s emotional well-being. Moreover, Smith and Sublett both informed Mary that T.J.H. needed counseling; they put her on notice that T.J.H. demonstrated the behavioral inability to act as children his age traditionally act. Though Mary may not be responsible for inflicting the more serious injuries to T.J.H.'s emotional well-being (e.g., injuries stemming from Bob's sexual abuse), she is responsible for failing to take the appropriate measures to heal those injuries.

[62] *See In re J.O.A.*, 283 S.W.3d at 346.

35

sufficient to support the trial court's determination under section 161.001(1)(E), we need not address the other endangerment ground the court found to support termination.

## D. Best Interest

In parent-child termination proceedings, there is a strong presumption that the children's best interest is usually served by keeping them with their natural parents.[63] The Texas Supreme Court has recognized several factors to consider in determining whether termination is in a child's best interest.[64] These include: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent which may indicate the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions of the parent.[65] This list of factors is not exhaustive, and no single consideration is controlling.[66] Likewise, a fact finder is not required to consider all of the listed factors.[67]

Testimony from Smith and Ronald reveals that T.J.H. does not wish to return to Mary. The evidence shows that T.J.H.'s emotional needs are currently being met by his foster family. They have provided T.J.H. with the counseling and medical services

---

[63] *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976).

[64] *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

[65] *Id.*

[66] *Id.*

[67] *Id.*

36

necessary to bring stability to his life; as a result, T.J.H.'s demeanor has improved and he has not had uncontrollable outbursts at school. The evidence supporting the trial court's finding of endangerment under subsection 161.001(1)(E) also supports a conclusion that Mary would pose a continuing danger to T.J.H.'s physical or emotional well-being now and in the future. Ronald and his wife, who along with T.J.H. are caring for five children, have demonstrated suitable parenting skills and a desire to safeguard T.J.H.'s physical and emotional well-being. And unlike Mary, the foster family has demonstrated a willingness to afford T.J.H. the counseling and medical care he needs. Lastly, there is little that can be found in the record to excuse Mary's blameworthy acts or omissions toward T.J.H.

In light of all of the evidence, the trial court could have reasonably formed a firm belief or conviction that termination of Mary's parental rights was in T.J.H.'s best interest. Accordingly, we hold that the evidence is both legally and factually sufficient to support the trial court's finding that termination of Mary's parental rights was in the best interest of T.J.H. We thus overrule Mary's legal and factual sufficiency challenges.

## IV. INEFFECTIVE ASSISTANCE OF COUNSEL

In her last issue on appeal, Mary argues that the trial court erred in denying her motion for new trial, wherein she protested receiving ineffective assistance of counsel at her termination hearing. The Texas Supreme Court has held that the statutory right to counsel in parental rights termination proceedings includes a guarantee that counsel will perform effectively.[68] In analyzing the effectiveness of counsel in a parental rights termination case, we follow the standard set forth by the United States Supreme Court in

---

[68] *In re M.S.*, 115 S.W.3d 534, 544 (Tex. 2003).

*Strickland v. Washington.*[69]  To prevail on an ineffective assistance of counsel claim, one must show by a preponderance of the evidence that (1) trial counsel's performance was deficient in that it fell below an objective standard reasonableness, and (2) a reasonable probability exists that but for counsel's unprofessional errors, the result of the proceeding would have been different.[70]

"With respect to whether counsel's performance in a particular case is deficient, we must take into account all of the circumstances surrounding the case, and must primarily focus on whether counsel performed in a 'reasonably effective' manner."[71]  We examine the totality of counsel's representation to determine whether appellant received effective assistance, but do not judge counsel's strategic decisions in hindsight; rather, we give "great deference" to counsel's performance and strongly presume that counsel's conduct falls within the wide range of reasonable professional assistance.[72]  It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it that the challenged conduct will constitute ineffective assistance.[73]  Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness.[74]

Mary argues that her trial counsel was ineffective because of his failure to present certain evidence.

---

[69] *In re H.R.M.*, 209 S.W.3d 105, 111 (Tex. 2006); *In re M.S.*, 115 S.W.3d at 545.

[70] *Strickland v. Washington*, 466 U.S.668, 687-88, 694 (1984).

[71] *In re M.S.*, 115 S.W.3d at 545.

[72] *Id.*

[73] *Id.*

[74] *In re K.K.*, 180 S.W.3d 681, 685 (Tex. App.–Waco 2005, no pet.).

*First*, Mary complains about her trial counsel's failure to present "the CPS video recordings of [T.J.H.'s] interviews" after the belt incident. The videotapes were not shown to the trial court during the hearing on Mary's motion for new trial. Mary asks this Court to assume, based on the Department's failure to present the tapes, that the tapes were favorable to her case. We cannot, however, engage in such speculation.[75]

*Second*, Mary complains that her trial counsel failed to give her the opportunity to explain why T.J.H.'s injuries could not have been caused the morning of the belt incident and why the injuries could not have been caused by a belt. The record of the termination hearing, reveals the following exchange between Mary and her trial counsel:

> Q:     You have any explanation for those bruises that, you know, are showing up on those pictures [from the belt incident]?
>
> A:     I have no idea how they would have gotten there. I can just think of numerous' you know; numerous, you know, things that he could have done to get them. But I have no explanation, no.
>
> Q:     You did not see those over the weekend or prior to Monday when he was at the hospital?
>
> A:     No sir. I saw them when I got to the school.

The record thus indicates that Mary's trial counsel gave her ample opportunity to discuss her thoughts on T.J.H.'s bruises. Any opinion that Mary failed to express about T.J.H.'s bruises cannot be blamed on her trial counsel.

*Third*, Mary complains about her trial counsel's failure to present medical records stemming from the medical evaluation T.J.H. received the day of the belt incident. The records indicate that T.J.H.'s body had bruising and a rash, but nothing else. This is not inconsistent with (1) the testimony of multiple witnesses who saw T.J.H. the day of the belt

---

[75] *See id.*

39

incident, or (2) the pictures of T.J.H.'s injuries, which were presented at the termination hearing. The medical records do not negate this evidence. Furthermore, Mary notes that the records do not indicate that the doctor evaluating T.J.H. attributed his bruises to physical abuse. The mere fact that the doctor did not express an opinion as to whether T.J.H.'s bruises were caused by physical abuse, however, does not negate the evidence supporting a finding of physical abuse. The trial court heard multiple witnesses testify that T.J.H. had attributed his bruises to being hit with a belt by Harry.

*Fourth*, Mary complains about her attorney's failure to present additional favorable testimony from Mary Ann Johnson. Johnson, a counselor who Mary and Harry had been meeting with, testified at the termination hearing. Mary complains that her attorney failed to give Johnson copies of psychological evaluations done on Mary's family prior to any meetings with Johnson. But when asked at the motion-for-new-trial hearing whether seeing the psychological evaluations was important to her testimony in the case, Johnson responded, "No, not really." According to Johnson, she only wanted to review the evaluations to substantiate statements that Mary had made to her. At the hearing on Mary's motion for new trial, Johnson was asked if there was any important matter on which Mary's attorney failed to question Johnson at the termination hearing. Johnson replied that she could not remember anything specific.

With regard to the four aforementioned complaints, we find that the record does not affirmatively demonstrate the alleged ineffectiveness. There are, however, four more complaints that Mary raises. One of these complaints concerns the failure of Mary's attorney to present the testimony of Laurie Gonzales, whose testimony would have called into question whether Harry was responsible for bruising T.J.H. on the day of the belt

40

incident. The other remaining three complaints concern her attorney's failure to present psychological evaluations of T.J.H., Mary, and Harry.

Although Mary filed a motion for new trial, on which a hearing was held, her trial counsel did not attend the hearing. In the absence of a proper evidentiary record developed at a hearing on a motion for new trial, it is extremely difficult to show that trial counsel's performance was deficient.[76] When there is no hearing on a motion for new trial or if trial counsel does not appear at such a hearing, an affidavit from trial counsel becomes almost vital to the success of a claim of ineffective assistance of counsel.[77] Here, there is no such affidavit in the record. Mary has not rebutted the presumption that her trial counsel made all significant decisions in the exercise of reasonable professional judgment, and Mary has not demonstrated in the record that trial counsel rendered ineffective assistance. We will not speculate about counsel's strategic decisions, and thus, we cannot find Mary's trial counsel ineffective based on the four remaining complaints. We thus overrule Mary's final issue on appeal.

## V. CONCLUSION

We affirm the trial court's decree of termination.

LINDA REYNA YAÑEZ,
Justice

Memorandum Opinion delivered and
filed this the 26th day of August, 2009.

___

[76] *Gibbs v. State*, 7 S.W.3d 175, 179 (Tex. App.–Houston [1st Dist.] 1999, pet. ref'd).

[77] *Howard v. State*, 894 S.W.2d 104, 107 (Tex. App.–Beaumont 1995, pet. ref'd).

41